**In re N–REN CORPORATION, Debtor.**

**MAPCO FERTILIZER, INC., Plaintiff,**

**v.**

**N–REN CORPORATION, Defendant.**

**Bankruptcy No. 1–86–00144.**
**Adv. No. 1–86–0156.**

United States Bankruptcy Court,
S. D. Ohio, W.D.

Oct. 23, 1986.

Jeffrey Marks, Taft, Stettinius & Hollister, Cincinnati, Ohio, for debtor.

Robert A. Goering, Wilke & Goering, Cincinnati, Ohio, for plaintiff.

Thomas L. Gabelman, Graydon, Head & Ritchey, Cincinnati, Ohio, for lender.

Paul A. Nemann, Cohen, Todd, Kite & Stanford, Cincinnati, Ohio, for creditors committee.

## DECISION AND ORDER

BURTON PERLMAN, Bankruptcy Judge.

This is an adversary proceeding initially instituted by plaintiff Mapco Fertilizer, Inc. (hereafter Mapco) against two defendants, the first of them being debtor, and the other, N–Ren Illinois, Inc., a wholly-owned subsidiary of debtor. Initially the complaint sought limited relief regarding a procedure known as a "turnaround" at a plant operated by a joint venture in which plaintiff and N–Ren Illinois, Inc. are joint venturers. That problem was resolved by the parties outside the litigation process. Subsequently, however, further matters have been put in controversy between these parties, and it has been determined that such matters shall be resolved in this adversary proceeding and in this court.* It will be most efficient in this decision for us to quote verbatim from our earlier decision referred to in the footnote as to certain basic facts which are not in controversy:

> The early allegations of the complaint provide background as to the relationship

---

* Plaintiff here filed suit in the Illinois state courts against N–Ren Illinois, Inc., seeking that that court order cessation of the joint venture plant. We issued a preliminary injunction against that suit on September 10, 1986, Adversary No. 1– 86–0203. The issues raised in the complaint in the Illinois suit then, via a motion for which an expedited hearing was sought, were introduced into the present litigation.

between the parties, viz., that on or about November 30, 1977, Mapco and N–Ren Illinois, Inc. entered into a joint venture agreement pursuant to which they were to manufacture and market urea ammonium nitrate (UAN) and other products; on that date, they also entered into a purchase agreement whereby debtor sold to Mapco some real estate adjacent to other real estate owned by debtor; that debtor constructed a plant on the acquired real estate for Mapco which cost $12.2 million; that in the joint venture agreement, debtor was named manager of the joint venture and again on November 30, 1977, a management agreement was executed between the joint venture and the debtor; and that there was a further agreement on that date between the joint venture and the debtor whereby debtor was to provide certain services and supplies to the joint venture from debtor's facilities.

After the Chapter 11 case was filed January 15, 1986, on February 13, 1986, debtor, N–Ren Illinois, and Mapco entered into a tolling agreement pursuant to which the services and supply agreement, the joint venture agreement, and the management agreement were modified and/or suspended. The joint venture plant was then operated pursuant to the tolling agreement until June 27, 1986, when debtor shut it down.

We now add to the foregoing, further uncontroverted facts that we find on the present record. A certain rotor is an important piece of equipment at the joint venture plant. The shut-down on June 27, 1986 resulted from a mechanical breakdown and the resultant suspension of insurance coverage. The plant was started up again on August 22, 1986, though Mapco did not agree to such start up.

The joint venture UAN plant is located in close proximity to an ammonia manufacturing plant belonging to and operated by debtor, it having been the intention of the parties that the joint venture facility use ammonia produced by debtor's plant in the operation of the joint venture plant. Debtor maintains two storage tanks for anhydrous ammonia, and to the extent that ammonia produced by debtor's plant is not utilized in the joint venture facility, it is stored in the tanks. The useful storage capacity of such tanks is 39,200 tons.

We make reference to certain terms of the tolling agreement which are central to the present controversy. There are three parties to that agreement, debtor, Mapco, and N–Ren Illinois, Inc. The agreement recites the existence of the three agreements dated November 30, 1977 to which we have referred above, and also to the fact that N–Ren Corporation is operating pursuant to a pending Chapter 11 reorganization case. The agreement then provides that production pursuant to it shall cease on April 30, 1986 unless extended. Mapco was to purchase all N–Ren inventory and pay for it by May 7, 1986 at $145.00 per ton of anhydrous ammonia and $93.47 per ton for UAN, to be paid by May 7, 1986. N–Ren is to pay the daily demand charges by Ni-Gas of about $6,900.00 "and all other costs of operating its anhydrous ammonia plant" except for natural gas which shall be supplied by Mapco, Mapco also to pay for use tax on such natural gas which it provides. Mapco is to remove from N–Ren's tanks all production of anhydrous ammonia by June 30, 1986. In mid-April, the parties agreed to an extension of the tolling agreement to June 30, 1986.

We have before us a number of questions which both parties have submitted and both have indicated a need for urgency in their disposition. Those by Mapco were presented as three motions in a single filing:

1. A motion to require that N–Ren carry insurance on the rotor as required by paragraph 5.02(g) of the management agreement;

2. A motion requiring N–Ren, manager of the joint venture facility, to cease operation thereof until the joint venture committee constituted under the joint venture agreement, authorizes its operation; and

3. A motion requiring that N–Ren, if the joint venture facility is to operate, use

the ammonia previously purchased from N–Ren in operation of the joint venture facility in producing UAN for Mapco.

N–Ren for its part has filed a motion for an order requiring that Mapco remove some 16,000 tons of anhydrous ammonia from N–Ren's storage tanks as required by paragraph seven of the tolling agreement, and also requested that this motion be handled on an expedited basis.

Because the parties represented to us that the questions raised in their several motions were urgent, we allowed them to be handled on an expedited basis as requested. At a pretrial conference which was held, it was agreed that the criteria to be applied in deciding whether relief should be granted would be those applicable to a motion for a preliminary injunction. Two separate hearings were held. The first dealt with the first two motions by Mapco which are listed above. The second hearing dealt with the third motion of Mapco and also the motion of N–Ren. The testimony of witnesses was taken at both hearings. Following the first hearing, the parties filed written memoranda, and thereafter each filed a responsive memorandum. No memoranda are to be submitted in respect to the second hearing.

After due consideration of what has been presented to us, we are satisfied that, applying the usual tests for the propriety of granting a preliminary injunction (see our decision identified *supra* in the footnote), neither party is entitled to such relief as to any motion here before us. We make the following observations as to each of the motions:

■ 1. Mapco motion for insurance. The unrebutted evidence at the hearing was that Mapco agreed to insurance on the rotor at $40,000.00, and agreed to waive the contractual provision that insurance on that item be at $75,000.00. The parties have operated on this basis for many years, and Mapco seeks only now to enforce the contract in this respect. On the record before us, Mapco is not entitled to enforcement of that contract provision, and certainly not in a proceeding seeking preliminary relief. In regard to this motion, Mapco has failed to show a likelihood of success at final hearing or irreparable damage.

■ 2. Mapco motion to require cessation of operation of the joint venture plant. It is uncontroverted that the normal selling season for UAN is in the spring when crops are planted. There is no significant market for UAN at this time, and it is unwarranted to predicate a loss on the current market price for UAN. The business in which the parties are engaged is a highly seasonal one, and a common way to do business is to manufacture product during the year and store it for sale in the spring. Mapco contends that the prospects for fertilizer sales in the coming spring are dim, but this has been true in the past and yet the joint venture facility continued to operate at full capacity, without objection by Mapco so far as this record shows. Despite the depiction by Mapco of a fading future for nitrogen products, as recently as February of this year, it entered into the tolling agreement here in litigation, the terms of which make it clear that Mapco was very anxious to secure production of UAN. In respect to this motion, assuming that the relief to be sought at trial will be the shut-down of the joint venture facility on equitable grounds, we are not persuaded that Mapco has shown a likelihood of success, nor irreparable damage if preliminary relief is denied.

As an alternative basis for denying preliminary injunctive relief on this motion, because we do not know what the issues would be at a final hearing, we cannot tell whether it is likely that Mapco will succeed at final hearing. Mapco therefore has failed to carry its burden of justifying this vital element of a case seeking preliminary injunctive relief.

■ 3. Mapco motion that N–Ren use previously purchased ammonia. This motion fails because irreparable harm is not established. Further, the likelihood of success at final hearing is dubious, for there is no existing contractual provision which gives Mapco a right to this relief. It would

depend entirely upon the court finding as an equitable matter that it should be allowed. The present record is not compelling towards such an outcome.

■ 4. N–Ren motion requiring that Mapco remove ammonia. The justification for an expedited hearing on this motion was that N–Ren's storage tanks are reaching capacity, and in order that the ammonia plant continue in operation, which is essential for the well-being of N–Ren, ammonia must be removed from the tanks to make room for further production. This motion fails for absence of evidence of irreparable harm. Both parties, N–Ren and Mapco, are in the process of removing ammonia from the tanks. A difficulty in that process has been that the most economical way of emptying the tanks has been via use of tankers, and because of flooding in the area, passage for tankers has not been possible. That situation is passing, and transport of ammonia by tanker is now possible. Irreparable harm is not shown.

\* \* \*

In disposing of the motions before us, the following observations must be made. To accommodate the requests by both parties for expedition in the handling of their motions, we have permitted irregular procedures. We find now the consequence of such flexibility. As we went along, we directed Mapco to file a revised complaint in order to define the issues in the case. Mapco has ignored our direction. In its recently filed responsive memorandum regarding the subject matter of the first hearing, Mapco has introduced an entirely new and unheralded approach which it suggests represents the ultimate relief it seeks, viz., that the bankruptcy filing terminated the several contractual relationships between the parties. Mapco's adversary, of course, is disadvantaged when this vital material is introduced into the litigation at this late date, for its adversary cannot then argue fully the case which is presented. Being now satisfied that there is no basis for expediting the relief sought by either party, we will not permit this litigation to proceed any further until it has

been procedurally regularized. The first step in that process is that Mapco must file an amended, supplemented, or otherwise revised complaint. If appropriate, debtor will be given an opportunity to file an amended answer and counterclaims.

After the pleadings are in order, either or both parties may assume the initiative of filing a stipulated record, with memoranda, upon which the court can render a final decision on any of the issues which are in the case. The parties could in this manner utilize the evidence which has been adduced in open court at the two hearings which have been held. If there is no such filing, the case will be scheduled for trial.

SO ORDERED.